Filed 4/23/20

<u>CERTIFIED</u> <u>FOR</u> <u>PARTIAL</u> <u>PUBLICATION</u>*

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>LIBERTY DANIELLE LANDOWSKI,<br><br>        Defendant and Appellant. | C080210<br><br>(Super. Ct. No. CRF145603) |
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>    v.<br><br>MICHAEL ANTHONY REYES, JR.,<br><br>        Defendant and Appellant. | C080308<br><br>(Super. Ct. No. CRF145603) |

---

*        Pursuant to California Rules of Court, rules 8.1105 and 8.1110, this opinion is certified for publication with the exception of parts III through VII.

THE PEOPLE,

                Plaintiff and Respondent,

      v.

LISA HUMBLE,

                Defendant and Appellant.

C080682

(Super. Ct. No. CRF145603)

APPEAL from a judgment of the Superior Court of Yolo County, Paul K. Richardson, Judge.  Affirmed.

Stephen M. Hinkle, under appointment by the Court of Appeal, for Defendant and Appellant Liberty Danielle Landowski; Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant Michael Anthony Reyes, Jr.; Stephen M. Lathrop, under appointment by the Court of Appeal, for Defendant and Appellant Lisa Humble.

Kamala D. Harris and Xavier Becerra, Attorneys General, Gerald A. Engler, Chief Assistant Attorney General, Michael P. Farrell, Senior Assistant Attorney General, Catherine Chatman, Supervising Deputy Attorney General and R. Todd Marshall, Deputy Attorney General, for Plaintiff and Respondent.

Defendant Michael Anthony Reyes, Jr., an active Norteño gang member (from the Broderick Boys subset), confronted a former Norteño gang member (from the Franklin Boys subset), S., about a physical altercation that occurred between S. and Reyes's stepfather over a debt.  That earlier altercation had taken place in front of Reyes's autistic younger brother.  Reyes pulled out a handgun and asked S. if he had a problem.  S., who was riding his bicycle with his wife, R., when Reyes confronted him with the gun, stopped briefly, told Reyes to put the gun down if he wanted to fight, and then started to ride away.  This angered Reyes, prompting him to fire six rounds at S. from behind.  S.

2

was hit three times but survived the encounter. R. was a short distance in front of S., and also in the line of fire, but was not hit by any of the bullets. Defendants Liberty Danielle Landowski and Lisa Humble were with Reyes at the time of the shooting and aided in his efforts to avoid being apprehended by law enforcement authorities.

Reyes, Landowski, and Humble were tried together before the same jury. Reyes was convicted of one count of attempted murder (Count 1), two counts of assault with a semiautomatic firearm (Counts 2 and 4), one count of possession of a firearm by a convicted felon (Count 5), and one count of possession of ammunition by a convicted felon (Count 6). In addition to various firearm and other enhancements, the jury found Reyes committed the crimes for the benefit of, at the direction of, or in association with a criminal street gang with the specific intent to promote, further, or assist in criminal conduct by gang members. The jury convicted Landowski and Humble of being accessories to Reyes's criminal conduct (Count 9) and also found true gang enhancement allegations attached to that crime.[1] After finding Reyes previously served a prison term for a felony conviction, the trial court sentenced him to serve an aggregate indeterminate prison term of 41 years to life plus a consecutive determinate term of 27 years. Humble was sentenced to serve a determinate prison term of three years four months. Landowski was granted three years formal probation.

On appeal, (1) Reyes challenges the sufficiency of the evidence to support his conviction for assaulting R. with a semiautomatic firearm; and (2) all defendants challenge the sufficiency of the evidence to support their gang enhancements. In the published portion of the opinion, we conclude the evidence was more than sufficient

---

[1]    The jury acquitted Reyes of Counts 3 and 7, charging him with the attempted murder of R. and the crime of participation in a criminal street gang. An additional codefendant, Eric Lovett, was charged with Reyes, Landowski, and Humble in the same case. However, he was charged only with dissuading a witness (Count 8), and this count was severed from those brought against the defendants in these appeals.

to support the jury's conclusion Reyes assaulted R. with a semiautomatic firearm. With respect to the gang enhancements, we conclude the evidence is sufficient to establish both that Reyes shot S., and that Landowski and Humble aided his attempt to avoid apprehension, "for the benefit of, at the direction of, or in association with a criminal street gang" and "with the specific intent to . . . assist in any criminal conduct by gang members" within the meaning of Penal Code[2] section 186.22, subdivision (b)(1).

The defendants' remaining contentions will be addressed in the unpublished portion of the opinion. Humble and Landowski bring additional claims related to their gang enhancements: (3) Humble contends the trial court prejudicially erred and violated her constitutional rights by allowing the prosecution's gang expert to relate inadmissible case-specific hearsay to the jury; and (4) Landowski asserts the trial court prejudicially erred and violated her federal constitutional rights by declining to provide the jury with two requested special instructions elaborating on the elements of the gang enhancement. Assuming the trial court erred by allowing the gang expert to relate case-specific hearsay to the jury, we conclude the error was harmless. We reject Landowski's claim of instructional error.[3]

Returning to Reyes, he contends: (5) the prosecutor engaged in prejudicial misconduct; (6) we must remand the matter for a new sentencing hearing because Senate Bill No. 620 (2017-2018 Reg. Sess.) (Stats. 2017, ch. 682, §§ 1 & 2 (SB 620))

---

**2**      Undesignated statutory references are to the Penal Code.

**3**      We also reject Landowski's final remaining claim that the trial court erred in its award of presentence custody credit. Our review of the record indicates she was awarded 365 days of such credit that was used to satisfy the 365-day county jail term imposed as a condition of her grant of probation, and validly waived additional days of accrued credit in exchange for the grant of probation. (See *People v. Johnson* (2002) 28 Cal.4th 1050, 1055.) We mention this contention no further.

4

that became effective January 1, 2018 and amends sections 12022.5 and 12022.53 to give the trial court discretion to strike firearm enhancements in the interest of justice, applies retroactively to cases not yet final on appeal; and (7) we must also remand the matter to the trial court with directions to strike two one-year prior-prison-term enhancements because Senate Bill No. 136 (2019-2020 Reg. Sess.) (Stats. 2019, ch. 590, § 1 (SB 136)) that became effective January 1, 2020 and eliminates such enhancements for Reyes's crimes, also applies retroactively to cases not yet final on appeal. We conclude two asserted bases for Reyes's prosecutorial misconduct claim are forfeited; the sole remaining basis, arguably misconduct, was harmless. Reyes's claims regarding the retroactive application of SB 620 and SB 136, however, have merit and require remand for a new sentencing hearing during which the trial court shall exercise its discretion regarding the firearm enhancements and strike the prior-prison-term enhancements.[4]

## FACTS

S. was a member of the Franklin Boys subset of the Norteño street gang for about 20 years, roughly from the ages of 16 to 36 years old. The Franklin Boys claimed the Oak Park area of Sacramento as their territory. S. "dropped out" of the gang in 2003 when he was serving time at High Desert State Prison. S. received word he would be required to "do a removal" on another Norteño gang member, i.e., beat up or stab this person to "get him off the yard." He refused and informed prison staff he was dropping out of the gang. Following a debriefing, S. was separated from his former Norteño associates and served the remainder of his sentence. He was released sometime around 2005 and continued committing crimes in the Sacramento area, although no longer in association with any criminal street gang. The Franklin Boys did not accept S. back into

---

[4] This latter conclusion makes it unnecessary to address Reyes's assertion that the trial court improperly imposed two, rather than one, prior-prison-term enhancements.

the gang following his release, nor did he face any repercussions from having dropped out because he did not inform on anyone during his prison debriefing and, as S. put it, "Sacramento is kind of full of dropouts."

S. met Reyes's stepfather, D., in 2013. D. lived in West Sacramento with Reyes's mother and their son, Reyes's younger half-brother. Toward the end of that year, S. and D. got into two fist fights. As S. explained, "he owed me some money, didn't want to pay it back, got disrespectful, spit at my face, so . . . we got into a fight." After that initial altercation, they got into another fist fight when S. again confronted D. about the debt as the latter was walking down the street with his son. S. admitted selling methamphetamine at the time he and D. got into these two fights, but denied selling drugs in the West Sacramento area, claiming that was just a "kickback area." As we explain more fully later in the opinion, West Sacramento was claimed by the Broderick Boys subset of the Norteño street gang.

S. spent most of 2014 incarcerated following a drug conviction. When he got out of custody, he met Reyes for the first time. Reyes was an active member of the Broderick Boys who had spent all of 2013 and half of 2014 incarcerated following convictions for various felonies. Reyes ran into S. "on the street" in West Sacramento sometime in October 2014. S. had just been released from custody at the time. He was looking for his wife, R. Reyes knew R. and offered to help him find her. After realizing Reyes was D.'s stepson, S. explained his side of the aforedescribed altercations and said D. was "going to get it" whenever he saw him again. Reyes responded: "Well, that's fine with me. Just leave my family out of it. [D.] can take care of himself. He's not a punk." Both S. and Reyes described the conversation as amicable. As Reyes explained, "as far as I was concerned, we came to an agreement."

### The Shooting

Reyes shot S. in the back on the morning of November 18, 2014. The night before, Reyes stayed at a motel in West Sacramento with Landowski, who rented the

6

room and with whom he recently began a sexual relationship. Also staying in the room were Eric Lovett, who like Reyes was an active gang member in the Broderick Boys subset, and Lovett's girlfriend, Humble. Landowski and Humble were also close friends. Reyes used methamphetamine that night and left early the next morning to get more of the substance. Landowski gave him a ride in her white Ford Mustang. While Reyes testified that only he and Landowski were in the car, substantial evidence supports the conclusion Humble was also present.[5] Lovett may also have been in the car, although the record is less than clear on that point.

What is clear is Landowski drove down Sycamore Avenue and when she got to the intersection with Evergreen Avenue, Reyes spotted S. and R. riding their bicycles down Evergreen towards Sycamore. Landowski stopped the car and Reyes got out of the front passenger side to confront S. Reyes explained the reason for the confrontation: "I had heard . . . that [S.] had got on [D.] and either did or tried to stab him with a screwdriver while he was with my little brother. [¶] . . . [¶] I was pissed. We had an agreement. I told him to leave my little brother -- you know, my family out of it. My little brother is autistic. He doesn't really -- he doesn't really -- certain things that happen, they affect him differently than most people." R., who was riding her bicycle in front of S., rode past the Mustang on Sycamore as Reyes got out with a loaded semiautomatic handgun and said to S.: "[W]hat's up motherfucker? You got a problem?" S. stopped and said he

---

[5]     R. identified Humble as the driver of the car when showed a photo lineup after the shooting. However, she testified the driver had "bleach-type" blonde hair, which corresponded to Landowski's hair color, whereas Humble's hair was darker. R. also testified the car "looked full" and told the detective who spoke to her after the shooting that she believed there were three people in the back seat, one of whom was female. This detective acknowledged in his testimony, however, that R. "was not certain" about this. In any event, because Humble was convicted of being an accessory to Reyes's criminal conduct based on her aiding his attempts to avoid apprehension, for our purposes it does not matter whether she was in the car or not.

did not have a problem as long as Reyes had a gun, and challenged him to put the gun down if he wanted to fight. R. continued riding her bicycle toward the nearest side street, Proctor Avenue, and told S., "just go, just go, pedal your bike, come on, just go." S. started to ride away from the confrontation with Reyes, following his wife towards Proctor. Reyes explained his reaction: "He just pushes off, like fuck you, and just pushes off on me. So I'm like what the fuck. [¶] . . . [¶] . . . He's supposed to be this big, bad, hard-core dude. I mean, come on. So I got mad, and I shot him."

Reyes fired six rounds at S. from behind, hitting him once in the back, once in the back of the leg, and once in the back of the arm. According to R.'s testimony, when the shots were fired, she had already made the turn from Sycamore onto Proctor, and S., following at a distance of about 14 feet, cut the turn onto Proctor by pedaling across the corner house's lawn. Feeling a stinging pain in his back and arm, S. got off his bicycle and walked across the lawn, saying, "I got hit, I got hit," before he collapsed and passed out. R., fortunately not hit by any of the bullets, quickly pedaled to a neighbor's house, ran up to and knocked on the front door, and asked that neighbor to call 911. Meanwhile, the Mustang departed the scene. According to Reyes, Landowski drove away before he was done firing, leaving him to depart on foot and hide in the neighborhood before getting a ride into downtown Sacramento from someone else.

*Initial Investigation and Apprehension*

Police and emergency medical personnel arrived a short time after the shooting. The first officer who arrived on scene asked S. if he had been shot. S. moaned in response and eventually said he had, identifying "Chubbs" as the shooter. From other investigations, the officer knew Reyes went by that street name. S. was transported to the hospital, where he received treatment for his injuries.

A detective who also arrived at the scene spoke briefly to R. and transported her to the police station for a more in-depth interview. She also identified Reyes as the shooter and described the driver of the Mustang as a "skinny" white girl with a bleach blonde

8

pony tail.  An investigation of Facebook accounts linked to Reyes's account revealed the aforedescribed relationships between Reyes, Landowski, Humble, and Lovett.  It also revealed several photos in which both Humble and Landowski appeared with a white Mustang.  One of these photos, on Landowski's Facebook page, showed the car's license plate.  A license plate check revealed the car was registered to her.  Two photo line-ups were created, one containing Humble's photo and the other containing Landowski's photo.  These line-ups were shown to R., who identified Humble as the driver.  While she did not identify Landowski, instead identifying an unrelated person as also having been in the car, R. commented on Landowski's photo, noting the part in her hair resembled that of the driver.

Meanwhile, another detective determined the location of Landowski's cell phone by having her cell phone carrier "ping" the phone using GPS.  The phone's location was in the vicinity of the Crowne Plaza motel in Sacramento.  Multiple law enforcement officers went to that motel in the late afternoon.  Two detectives spoke to the manager and showed him Landowski's photo.  The manager informed the detectives she had been at the motel with Reyes and Humble, whose photos he was also shown, but they were asked to leave due to noise complaints from other guests.  As they were leaving, one of the defendants said they were going to the La Quinta Inn, a different motel a short distance away.  The manager also passed this information along to the detectives.

The first detective to arrive at the La Quinta Inn spotted Lovett in the parking lot getting out of a different car registered to Landowski's father.  The detective watched Lovett walk into the motel and then waited for the other detectives and officers to arrive on scene and set up a perimeter.  About 15 minutes later, Lovett was taken into custody as he attempted to leave the motel.  A card key in his pocket led the detectives to room 228, where Reyes, Landowski, and Humble were also taken into custody.  The gun Reyes

9

used to shoot S., still loaded, was recovered from Humble's waistband. Reyes's holster was also found in the motel room.

### Subsequent Investigation and Additional Accessory Evidence

The room at the La Quinta Inn was rented by Humble's ex-boyfriend's mother, who testified she met Humble at the motel that evening after Humble contacted her through Facebook.

A receipt from Rite Aid was found in the car registered to Landowski's father. Review of surveillance video revealed Landowski and Humble went into that store at around noon, roughly four hours after the shooting, and bought various bathroom products. While Landowski's father reported the car stolen, when informed by a detective that filing a false police report was a crime, he admitted Landowski had the keys to the car "and that he was just protecting his daughter."

A forensic extraction of data from Reyes's cell phone revealed about two hours after Landowski and Humble picked up supplies at Rite Aid, three e-mails were sent from Humble's e-mail address to Reyes's e-mail address containing police scanner audio files of dispatch audio relating to the shooting. Later in the evening, before the defendants were taken into custody, Reyes's cell phone used a search engine to pull up a news article about the shooting.

Landowski's Mustang was never found. The car's license plate was found five months later on a Pontiac Grand Am. While Landowski and Humble were in jail awaiting trial, various calls were made in which they apparently referred to the Mustang.[6] In one of the calls, Humble called her aunt and asked someone named K. whether "that thing" was still at her house. K. said it was. Humble also said in the call, "that's like the

---

[6]    Statements made by Landowski during these calls were admitted into evidence only against Landowski, and statements made by Humble during these calls were admitted only against Humble. The jury was so instructed.

10

biggest thing like they can't really charge me with something that they can't find." In another call to her aunt, Humble told the person who answered that the only evidence the police had against her and Landowski was the Rite Aid surveillance video showing them buying toiletries. Landowski also called Humble's aunt. During the call, she told the person who answered the phone to tell K. to "put [her] pony in the garage," adding: "She'll know what I'm talking about." Landowski's father testified his daughter did not own an actual pony.

### *Gang Enhancement Evidence*

Detective Anthony Herrera of the West Sacramento Police Department testified as an expert in criminal street gangs, particularly the Broderick Boys subset of the Norteño street gang operating in West Sacramento. He testified Reyes was an active member of this particular subset, a fact Reyes himself admitted in his testimony at trial. Reyes, still in his early twenties when he shot S., had been a Broderick Boys gang member since the age of 12. He also had a number of gang-related tattoos, identifying himself as both Norteño and Broderick Boy, including the letter "B" on the side of his head and "East Yolo" and "Aztec 14" on his face. Reyes acknowledged during his testimony these face tattoos are a clear indication to other people that he "bang[s]." We additionally note he referred to his gang membership as "a way of life" and his fellow Broderick Boys as "my family." Reyes does not challenge the sufficiency of the evidence to support the conclusion he was an active gang member at the time of the shooting.

Nor does Reyes challenge the sufficiency of the evidence to establish the Broderick Boys subset qualifies as a "criminal street gang" under section 186.22, subdivision (f). In support of that conclusion, Detective Herrera testified to the group's common name (Broderick Boys) and common identifying signs and symbols (both those representing membership in the larger Norteño gang, e.g., wearing the color red and use of the number 14 in gang signs and tattoos to represent the letter "N," the fourteenth letter of the alphabet, and those representing membership in the Broderick Boys subset, e.g.,

11

use of "B" and "BRK" (for Broderick) and "EYC" (for East Yolo County) in gang-related tattoos). The detective also testified the group has as one of its primary activities the commission of a number of criminal acts listed in the gang statute, such as murder, robbery, assault with a deadly weapon, and drug sales. (§ 186.22, subd. (e)(1)-(4).) He further testified to the facts of five predicate offenses involving Broderick Boys gang members establishing a "pattern of criminal gang activity" within the meaning of subdivision (e) of the statute. Reyes confirmed during his testimony that his Broderick Boys family "sell[s] dope [and] hurt[s] people."

What Reyes does challenge in this appeal is the sufficiency of the evidence to establish he shot S. "for the benefit of, at the direction of, or in association with" his gang and that he did so "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) Relevant to this contention, we note he admitted during his testimony that he was actively working to build a name for himself on the street, explaining, "there are big names out there" and he wanted his name to be "one of those names." Detective Herrera testified the commission of crimes was one way gang members make names for themselves. We recount the detective's testimony regarding how doing so benefits the individual gang member and the gang as a whole in the discussion portion of the opinion. For now, it will suffice to note the commission of crime, particularly violent crime, "spread[s] like wildfire through the community," according to the detective, and this "[w]ord of mouth" conveyance of fear is how the gang holds its territory and is a "huge benefit" to the gang.

Various conversations Reyes had on Facebook confirmed he was actively involved in committing crimes to enhance his reputation within the gang. In one such exchange, 11 days before the shooting, he wrote to Lovett and said: "I'm on a hunt. I acquired new information as new artillery. Listen for me." Lovett responded that Reyes showed "strong Norteño traits" and added: "We shall continue our march forward." Detective Herrera explained this exchange indicated Reyes and Lovett were "out there putting in

12

work" on behalf of the gang. In another conversation with a gang member who was highly respected within the gang (an "O.G." in gang parlance), Reyes said: "I'm a B Boy to the fullest" and, "I push N overall." The detective explained these statements indicated the gang was "everything to him." Reyes continued: "I'm building my name for my son will be able to walk proud in our hood." In response, the O.G. stated: "I got nothing but the u[t]most respect for you, brotha, . . . I have always heard nothing but good shit about you. Honestly, I wish we had more sols [i.e., soldiers] in the hood of your caliber. I know you're a real Broderick gangsta when I see one and my brotha in the whole hood I am aware of your presence."

With respect to this particular shooting, as previously mentioned, S. was a member of the Franklin Boys subset of the same larger Norteño gang, but dropped out of the gang in 2003, a decade before the dispute with Reyes's stepfather that ultimately resulted in him being shot by Reyes. Detective Herrera testified that disrespect is "huge in the gang subculture," adding: "If you get disrespected, you have to act upon it."

We finally note a number of case-specific hypothetical questions were posed to the detective. He opined a hypothetical active member of the Broderick Boys gang would have shot a hypothetical Franklin Boys dropout for the benefit of the Broderick Boys gang and with the specific intent to assist in criminal conduct by gang members where that hypothetical dropout was both selling drugs in West Sacramento, i.e., Broderick Boys territory, and getting into physical fights with the hypothetical shooter's family members.[7] With respect to Humble and Landowski, in response to hypothetical questions based on their conduct of aiding an active gang member in attempting to avoid apprehension after a shooting, Detective Herrera opined such conduct would also have been done to benefit the gang with the requisite specific intent.

---

[7]     We address in part II of the discussion whether or not the factual bases of this hypothetical were adequately supported by substantial evidence.

13

DISCUSSION

SUFFICIENCY OF THE EVIDENCE CLAIMS

I

*Assault with a Semiautomatic Firearm*

Reyes challenges the sufficiency of the evidence to support his conviction for assaulting R. with a semiautomatic firearm. We conclude there is more than enough evidence to support this conviction.

" 'To determine the sufficiency of the evidence to support a conviction, an appellate court reviews the entire record in the light most favorable to the prosecution to determine whether it contains evidence that is reasonable, credible, and of solid value, from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citations.]" (*People v. Wallace* (2008) 44 Cal.4th 1032, 1077; *Jackson v. Virginia* (1979) 443 U.S. 307, 317-320 [61 L.Ed.2d 560, 572-574].) "In deciding the sufficiency of the evidence, a reviewing court resolves neither credibility issues nor evidentiary conflicts. [Citation.] Resolution of conflicts and inconsistencies in the testimony is the exclusive province of the trier of fact. [Citation.] Moreover, unless the testimony is physically impossible or inherently improbable, testimony of a single witness is sufficient to support a conviction. [Citation.]" (*People v. Young* (2005) 34 Cal.4th 1149, 1181.)

In order to convict Reyes of assaulting R. with a semiautomatic firearm (§ 245, subd. (b)), the jury was required to find he "(1) willfully committed an act [with a semiautomatic firearm] which by its nature would probably and directly result in injury to [R.] and (2) was aware of facts that would lead a reasonable person to realize that a battery would directly, naturally, and probably result from [his] conduct." (*People v. White* (2015) 241 Cal.App.4th 881, 884.) As we have explained: " '[A]ssault does not require a specific intent to cause injury or a subjective awareness of the risk that an injury might occur. Rather, assault only requires an intentional act and actual knowledge of

14

those facts sufficient to establish that the act by its nature will probably and directly result in the application of physical force against another.' [Citation.] 'The mens rea [for assault] is established upon proof the defendant willfully committed an act that by its nature will probably and directly result in injury to another, i.e., a battery. Although the defendant must intentionally engage in conduct that will likely produce injurious consequences, the prosecution need not prove a specific intent to inflict a particular harm. . . . The evidence must only demonstrate that the defendant willfully or purposefully attempted a "violent injury" or "the least touching," i.e., "any wrongful act committed by means of physical force against the person of another." [Citation.] In other words, "[t]he use of the described force is what counts, not the intent with which same is employed." [Citation.] Because the offensive or dangerous character of the defendant's conduct, by virtue of its nature, contemplates such injury, a general criminal intent to commit the act suffices to establish the requisite mental state. [Citations.]' [Citation.]" (*People v. Golde* (2008) 163 Cal.App.4th 101, 108-109.)

Reyes acknowledges he committed an assault with a semiautomatic firearm against S. Indeed, he admitted as much in his testimony at trial. He also concedes, "a defendant who harbors the requisite mental state for assault, and who commits [an act or acts] such that a *direct, natural, and probable result* is a battery against *two* persons, may be convicted of assault against each." (See, e.g., *People v. Lee* (1994) 28 Cal.App.4th 1724, 1734 [firing three shots at a single intended victim constituted both attempted murder of the target and assault on a nearby non-target companion].) Reyes argues, however, "evidence of the likelihood that [his] acts against [S.] would foreseeably result in violent injury to [R.] is missing from the record." He is mistaken. S. testified R. was about two bicycle lengths in front of him when he pedaled past the Mustang and Reyes opened fire from behind. R. testified when the shots were fired, she had already turned onto Proctor Avenue from Sycamore Avenue, and S., following at a distance of about 14 feet, cut the turn onto Proctor by pedaling across the corner house's lawn. Reyes fired six

rounds at S., three of which hit their mark. Based on these accounts of the shooting, it was entirely foreseeable R. might also have been hit.

We conclude the jury reasonably could have found Reyes intentionally engaged in conduct with a semiautomatic firearm that would likely produce injurious consequences to both S. and R. No more is required to support the challenged conviction.

## II

### *Gang Enhancements*

All defendants challenge the sufficiency of the evidence to support their gang enhancements. We conclude each enhancement is supported by substantial evidence.

In order to find the gang enhancement allegations true, the jury was required to find (1) the crime to which the enhancement was attached was "committed for the benefit of, at the direction of, or in association with any criminal street gang," and (2) the crime was committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) The same substantial evidence test is used to determine the sufficiency of the evidence supporting the gang enhancements. (See, e.g., *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1329.) In short, we view the entire record in the light most favorable to the judgment, presuming in favor of that judgment the existence of every fact the jury could reasonably deduce from the evidence, and determine whether it contains evidence that is reasonable, credible, and of solid value, from which a reasonable jury could find the gang enhancement allegations true beyond a reasonable doubt. (*People v. Wallace*, *supra*, 44 Cal.4th at p. 1077.)

### A.

### *Reyes*

Reyes argues the evidence is insufficient to establish he shot S. "with the intent to benefit his gang," rather than for "purely personal reasons, because [S.] had fought with [his] family." We disagree.

16

## 1. *Detective Herrera's Testimony*

As previously described, in response to hypothetical questions, Detective Herrera testified a hypothetical active member of the Broderick Boys gang would have shot a hypothetical Franklin Boys dropout for the benefit of the Broderick Boys gang and with the specific intent to assist in criminal conduct by gang members where that hypothetical dropout was both selling drugs in West Sacramento, i.e., Broderick Boys territory, and getting into physical fights with the hypothetical shooter's family members. The detective added: "It is almost mandatory that that active gang member acts upon that, and does something to the subject who's disrespecting him, and his hood, and has to retaliate. [¶] . . . [¶] And that in turn benefits the gang as a whole, because of the name, the promotion of the name, the -- his [own] reputation and the reputation of the gang as a whole. They don't want to lose hold of that turf. The gang definitely receives the benefit, so does that individual."

During cross-examination, Detective Herrera was asked to assume the same hypothetical situation except the Broderick Boys shooter did not know the Franklin Boys dropout was in fact a dropout and also did not know he was selling drugs in Broderick Boys territory. Instead, the detective was asked to assume, the hypothetical shooter confronted the victim because the victim assaulted his family "and out of a fit of anger shoots him; is that necessarily a gang crime?" The detective answered in the affirmative and explained: "Because of the fact that an active gang member, who is out pushing politics on the street, you have to retaliate. Somebody assaulting your family, whether they're [a] gang member or not, you have to retaliate." He further clarified he believed the shooting "was personal, and also had the gang portion included in it."

Finally, dissecting the hypothetical in a question the detective essentially asked himself, he opined any one of the three components of the hypothetical (i.e., the victim (1) being a Franklin Boys dropout, (2) selling drugs in Broderick Boys territory, or (3) assaulting the shooter's family), "any one of those things for an active gang member

17

that is pushing prison politics on the street, he has to retaliate or he's going to be looked at as somebody who is weak."

## 2. *Analysis*

We begin our analysis by noting Reyes's briefing conflates the two elements of the gang enhancement. In so doing, he offers detailed argument regarding the first element's requirement that the crime be gang related, but does not offer any specific argument related to the second element, i.e., the crime must have been committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) We therefore consider any assertion that the second element is not supported by substantial evidence to be forfeited for failure to adequately brief the issue (see, e.g., *People v. Bryant* (2013) 222 Cal.App.4th 1196, 1206, fn. 11) and address only the first element.

The first element of the enhancement, i.e., the crime was "committed for the benefit of, at the direction of, or in association with any criminal street gang" (§ 186.22, subd. (b)(1)), was included "to make it 'clear that a criminal offense is subject to increased punishment . . . only if the crime is "gang-related" ' [Citation.]" (*People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*).) "A gang expert's testimony alone is insufficient to find an offense gang related. [Citation.] '[T]he record must provide some evidentiary support, other than merely the defendant's record of prior offenses and past gang activities or personal affiliations, for a finding that the *crime* was committed for the benefit of, at the direction of, or in association with a criminal street gang.' [Citation.]" (*People v. Ochoa* (2009) 179 Cal.App.4th 650, 657 (*Ochoa*).)

For example, in *People v. Ferraez* (2003) 112 Cal.App.4th 925 (*Ferraez*), our colleagues at the Fourth Appellate District affirmed the jury's finding of gang-relatedness where the defendant gang member, caught selling rock cocaine at a swap mall in another gang's territory with that gang's permission, claimed he did so for personal rather than gang-related reasons, i.e., to quickly make enough money to buy himself a car. (*Id*. at

pp. 930-931.) In response to hypothetical questions tracking the facts of the case, the prosecution's gang expert opined the drugs were being sold for the benefit of or in association with the defendant's gang and the proceeds of such sales would be used to purchase weapons, drugs, or to post bail for other gang members. (*Id*. at p. 928.) The court concluded this opinion testimony amounted to circumstantial evidence supporting the jury's finding because "[t]he hypothetical facts presented to the gang expert were properly rooted in the evidence presented at trial," adding: "It is well settled that expert testimony about gang culture and habits is the type of evidence a jury may rely on to reach a verdict on a gang-related offense or a finding on a gang allegation. . . . Here, the gang expert's testimony was necessary to explain to the jury how a gang's reputation can be enhanced through drug sales and how a gang may use the proceeds from such felonious conduct." (*Id*. at pp. 930-931.)

Acknowledging "the expert's testimony alone would not have been sufficient to find the drug offense was gang related," the *Ferraez* court concluded there was "other evidence from which the jury could reasonably infer the crime was gang related," such as evidence the defendant was a gang member who was selling drugs in another gang's territory, with that gang's permission, and defendant's gang was "on friendly terms" with the other gang. (*Ferraez*, *supra*, at p. 931.) Thus, an expert's opinion as to gang-relatedness, in response to a hypothetical question that was properly rooted in evidence supporting that opinion, constituted sufficient substantial evidence to uphold the gang enhancement.

Here, the hypothetical shooting about which Detective Herrera was asked to offer his opinion was rooted in three purported facts, (1) the shooter was a Broderick Boys gang member who knew the victim was a Franklin Boys dropout, (2) the victim was selling drugs in Broderick Boys territory, and (3) the victim assaulted a member of the shooter's family, any one of which would have required gang-related retaliation according to the detective. Reyes challenges the sufficiency of the evidence supporting

19

the first two factual bases for the detective's opinion and argues the remaining basis is not sufficient by itself to support the conclusion the shooting was gang related.

Beginning with the gang status of both Reyes and S., there was no dispute at trial concerning Reyes's status as an active member of the Broderick Boys or S.'s status as a former member of the Franklin Boys, the latter having dropped out of the gang in 2003. Detective Herrera testified both the Broderick Boys and the Franklin Boys were subsets of the larger Norteño gang, Broderick Boys claiming West Sacramento as their territory and Franklin Boys claiming the Oak Park area of Sacramento. The detective testified the rivals of the Broderick Boys include "all Sureños," a subset of Norteño gang members he referred to as "Northern Riders" who are active gang members but do not follow the rules laid out by their prison gang counterpart Nuestra Familia, and "all dropouts." With respect to dropouts, the detective explained a Norteño gang member who is following Nuestra Familia rules would consider a gang dropout "one of their main enemies" and "must act on sight," meaning, "stabbing, assaulting, punching, shooting, whatever." There was also evidence in the form of a message Reyes sent to another Broderick Boys gang member through Facebook indicating Reyes was actively following Nuestra Familia rules, or as Detective Herrera put it, "pushing prison politics on the street."

However, because there is no evidence in the record Reyes *knew* S. was a Franklin Boys dropout, we cannot conclude this basis for the detective's opinion is supported by substantial evidence. Reyes testified he had no such knowledge. And while the jury was not required to believe Reyes's testimony on the point, there still must be some evidence to the contrary in order for this court to conclude substantial evidence supports this basis for the detective's opinion the shooting was gang related. Far from there being evidence to the contrary, S.'s testimony supports a conclusion Reyes would not have known. Indeed, S. explained he dropped out in 2003, more than a decade before he met Reyes, and experienced no negative repercussions from his own gang or anyone else for having done so. Moreover, despite the detective's assurance that an active Broderick Boys gang

20

member would be required to assault "all dropouts" on sight, he also acknowledged Reyes had two known Broderick Boys dropouts as friends on Facebook.

Turning to S. selling drugs in West Sacramento, Detective Herrera testified doing so would be "a huge sign of disrespect" and would similarly require any Broderick Boys gang member to retaliate in the form of a violent assault. Reyes points to conflicts in the record concerning whether or not S. sold drugs in West Sacramento prior to being shot. Viewing the record in the light most favorable to the judgment, as we must, we conclude there is substantial support for a conclusion he was doing so. We need not recite that evidence here, however, because as with the evidence of S.'s dropout status, there is no evidence whatsoever establishing Reyes *knew* about S.'s drug sales in West Sacramento. Reyes testified he had no such knowledge. And again, while the jury was not required to believe Reyes's testimony on the point, there still must be some evidence to the contrary in order for this court to conclude substantial evidence supports this basis for the detective's opinion the shooting was gang related. There is no evidence from which to conclude Reyes knew or even suspected S. was selling drugs in Broderick Boys territory.

This leaves us with S.'s altercations with Reyes's stepfather, D., which we have previously described in detail. Reyes does not dispute there is substantial evidence supporting this as the reason he confronted S. and then shot him in the back. Detective Herrera testified, "one of the biggest disrespects ever" is to assault a gang member's family, adding, "it is not just in the gang subculture, it is also any other person, you know, mess with me, don't mess with my family, and if you do then you have a respect issue on two different realms," i.e., "one, the gang, you have to avenge that" and "two just being a man." The prosecutor asked: "So there is kind of a personal component and a gang component to those situations?" The detective responded: "Oh, yeah."

We conclude substantial evidence supports the detective's opinion Reyes possessed dual motives for shooting S., one personal and one gang related. Just 11 days

before the shooting, Reyes informed Lovett through Facebook that he was "on a hunt" looking for targets on behalf of the gang. He also bragged to an O.G. within the gang that he was a Broderick Boys gang member "to the fullest" and "push[ed] N," i.e., Norteño, "overall." Reyes explained in this exchange that he was "building [a] name" for himself for his son. The O.G. expressed respect for the work Reyes was putting in as a soldier in the Broderick Boys gang. Detective Herrera explained this high ranking member of the Broderick Boys would not have given that level of respect to "just anybody," adding: "You have to do stuff to earn that respect." The detective also testified the commission of crimes was one way gang members make names for themselves. He elaborated: "[W]hoever can put in the most work and make the best name for themselves and the best name for the gang, then their own reputation is going to receive the benefit and that gang . . . is going to receive the benefit for the name being promoted in the neighborhood, and also being able to maintain those streets as theirs." In the gang culture, the detective explained, "fear [is] synonymous with respect," both for the individual gang member and for the gang as a whole. He continued: "They think [if] someone fears them, they'll respect them. If they're going to go around and commit crimes, that's going to spread like wildfire through the community." According to the detective, this "[w]ord of mouth" conveyance of fear and perceived respect is how the gang holds its territory and is a "huge benefit" to the gang. Thus, while the confrontation between S. and Reyes's stepfather was undoubtedly personal, a reasonable jury could have concluded that for someone like Reyes, who was actively committing crimes in order to spread fear on behalf of the gang, and thereby enhance his reputation and position within the gang, while simultaneously enhancing the gang's status and ability to hold its territory of West Sacramento, shooting S. within that territory was not simply personal, but was also gang related.

Our conclusion is supported by our Supreme Court's decision in *Albillar*, *supra*, 51 Cal.4th 47. There, three gang members raped a 15-year-old girl. One of the gang

22

members brought her into a bedroom, kissed her, and removed her pants. To whatever extent she consented to these actions, that consent was withdrawn when the other two gang members came into the room and asked if they could "get in." The victim yelled for them to get out. The three gang members then held her down and raped her. (*Id.* at p. 52.) The court held substantial evidence supported the jury's conclusion the crime was committed to benefit the gang, relying on the gang expert's testimony about gang culture and the use of fear and intimidation to control gang territory. As the court described that testimony: "Holland testified that '[w]hen three gang members go out and commit a violent brutal attack on a victim, that's elevating their individual status, and they're receiving a benefit. They're putting notches in their reputation. When these members are doing that, the overall entity benefits and strengthens as a result of it.' Reports of such conduct 'rais[e] the[] level of fear and intimidation in the community.' Holland then applied his analysis to a hypothetical based on the facts of the crime here, where the victim knew that at least two of her assailants were members of Southside Chiques. 'More than likely this crime is reported as not three individual named Defendants conducting a rape, but members of [Southside] Chiques conducting a rape, and that goes out in the community by way of mainstream media or by way of word of mouth. That is elevating [Southside] Chiques' reputation to be a violent, aggressive gang that stops at nothing and does not care for anyone's humanity.' " (*Id.* at p. 63.) The court concluded: "Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)." (*Ibid.*)

While *Albillar, supra,* 51 Cal.4th 47 is factually very different from this case, it is apparent the defendants in that case had a non-gang-related motive for raping the victim, i.e., sexual gratification. Nevertheless, the court concluded the jury could have concluded they also possessed the gang-related motive of enhancing their reputation

23

within the gang and that of the gang as a whole.  Similarly, here, while Reyes had a personal motive for shooting S., the jury could have reasonably concluded he also had the same gang-related motive possessed by the defendants in *Albillar*.  Indeed, that inference is stronger in this case because it is supported by Reyes's Facebook conversations, recounted above, and by the fact that the gang expert in *Albillar* also testified that rape is generally frowned upon by Latino street gangs, whereas here, Detective Herrera testified a shooting such as this one would only have enhanced Reyes's and the gang's reputation.

Nevertheless, relying on *Ochoa*, *supra*, 179 Cal.App.4th 650, *People v. Ramon* (2009) 175 Cal.App.4th 843 (*Ramon*), and *People v. Albarran* (2007) 149 Cal.App.4th 214 (*Albarran*), Reyes argues, "an inference that [S.] 'disrespected' [Reyes] by fighting with [his] family member in front of [his] vulnerable younger brother" is not sufficient to support the detective's conclusion the shooting was, in addition to being personal, also gang related.  Reyes's reliance on these cases is misplaced.

In *Ochoa*, gang enhancement findings were reversed where the defendant gangmember approached a truck in a restaurant parking lot, attempted to rob the truck's sole occupant at gunpoint, and then committed carjacking by forcing the occupant out of the vehicle and driving away.  The defendant was alone when he committed the crimes, did not announce himself as a gang member while carrying them out, did not show any gang signs, and was not dressed in gang-related clothing.  (*Ochoa*, *supra*, 179 Cal.App.4th at p. 653.)  Nor was there evidence the defendant used the truck for gang-related purposes after taking it or claimed responsibility on behalf of his gang.  (*Id*. at p. 656.)  However, the prosecution's gang expert, while acknowledging, "crimes can be committed by a gang member for his [or her] own benefit," opined the defendant committed the carjacking "for the benefit of his gang" because such a crime "would benefit the gang by providing general transportation to the gang's members, by enabling transportation of narcotics for sale by the gang, by enabling transportation to commit

24

further crimes by the gang, by providing economic benefit to the gang by sale of the vehicle, by elevating defendant's status within the gang, and by raising the gang's reputation in the community." (*Ibid.*)

Concluding the gang enhancement findings were unsupported by substantial evidence, the *Ochoa* court first noted: "There was no evidence that *only* gang members committed carjackings or that a gang member could not commit a carjacking for personal benefit, rather than for the benefit of the gang." (*Ochoa*, *supra*, 179 Cal.App.4th at p. 662.) The court then explained: "Defendant did not call out a gang name, display gang signs, wear gang clothing, or engage in gang graffiti while committing the instant offenses. There was no evidence of bragging or graffiti to take credit for the crimes. There was no testimony that the victim saw any of defendant's tattoos. There was no evidence the crimes were committed in [the defendant's gang's] territory or the territory of any of its rivals. There was no evidence that the victim of the crimes was a gang member or [rival of the defendant's gang]. Defendant did not tell anyone, as the defendant did in *Ferraez*, that he had special gang permission to commit the carjacking. [Citation.] Defendant was not accompanied by a fellow gang member." (*Id.* at pp. 662-663, fn. omitted.) Finally, while the gang expert testified that the carjacking could benefit the gang in various ways, "he had no specific evidentiary support for drawing such inferences" and "admitted that there was no indication that defendant had used the vehicle to transport other gang members . . . [or] drugs or manifested any intention to do so." (*Id.* at p. 663.) Thus, the court concluded, the gang expert's testimony "as to how defendant's crimes would benefit [his gang], was based solely on speculation, not evidence." (*Ibid.*)

We acknowledge that, as in *Ochoa, supra,* 179 Cal.App.4th 650, there is no evidence Reyes called out his gang's name, displayed any gang signs, or otherwise indicated he was operating on behalf of the Broderick Boys when he shot S. Nor is there evidence Reyes bragged about the shooting among other Broderick Boys gang members.

However, none of these things are essential conditions of gang-relatedness. What distinguishes Reyes from the defendant in *Ochoa* is his active promotion of himself to other gang members, during which he admitted to searching for targets, and thereafter shot S. in the back in Broderick Boys territory in front of other people. While Humble and Landowski were not themselves gang members, and therefore an inference of gang-relatedness does not arise solely from the fact of commission of a crime with other gang members (see, e.g., *People v. Leon* (2016) 243 Cal.App.4th 1003, 1021; *People v. Morales* (2003) 112 Cal.App.4th 1176, 1198), it is reasonable to infer that by committing the crime in front of others, word of Reyes's deed would "spread like wildfire through the community," thereby enhancing his and the gang's reputation for violence.

More misplaced is Reyes's reliance on *Albarran*, *supra*, 149 Cal.App.4th 214, and *Ramon*, *supra*, 175 Cal.App.4th 843. In *Albarran*, the prosecutor admitted "he had no percipient witness or evidence to prove the crime was gang related or motivated" and instead relied solely on the gang expert's testimony. (*Albarran*, *supra*, at p. 219.) In *Ramon*, only two evidentiary facts supported the gang expert's opinion as to gang-relatedness, (1) the defendants were gang members, and (2) they were stopped in their gang's territory while armed and in possession of a stolen vehicle. (*Ramon*, *supra*, at p. 849.) Here, in addition to Reyes's status as a Broderick Boys gang member and commission of a shooting in Broderick Boys territory, the gang expert's opinion was supported by Reyes's own statements admitting he was looking for targets to enhance his status within the gang.

We conclude there is sufficient substantial evidence to establish Reyes shot S. "for the benefit of, at the direction of, or in association with any criminal street gang" within the meaning of section 186.22, subdivision (b)(1).

## B.

### *Humble and Landowski*

Humble and Landowski also challenge the sufficiency of the evidence supporting their gang enhancements. Again, in order to find these enhancement allegations true, the jury was required to find they aided Reyes in his attempt to elude apprehension (1) "for the benefit of, at the direction of, or in association with any criminal street gang," and (2) "with the specific intent to promote, further, or assist in any criminal conduct by gang members." (§ 186.22, subd. (b)(1).) We conclude the enhancements are adequately supported by substantial evidence based on an "association with" theory.

### 1. *Detective Herrera's Testimony*

The prosecutor asked Detective Herrera the following hypothetical question based on Humble's conduct: "If a female was in a dating relationship with an active Broderick Boy, assisted in hiding the car used for a shooting by another active Broderick Boy against a dropout Franklin Boy within Broderick Boy territory in West Sacramento. [¶] That same female was sending the shooter audio files of police scanner information following the shooting, about the shooting, was assisting in getting hygiene supplies for the shooter following the shooting. [¶] Rented . . . a hotel room for use by the shooter under another person's name, was holding or possessing a gun and ammo used for the shooting, for the shooter, as well as continued to assist in hiding the suspect vehicle even after in custody. [¶] Based on those specific facts, do you have an opinion as to whether those crimes were committed for the benefit of, at the direction of, or in association with a criminal street gang with a specific intent to promote, or further [or] assist in any criminal conduct, being felony conduct by a gang member?" The detective answered this hypothetical person would have taken those actions for the benefit of and in association with the Broderick Boys gang with the specific intent to assist in criminal conduct by gang members.

27

The prosecutor then asked the detective another hypothetical question based on Landowski's conduct: "Hypothetically speaking, if a female was in a sexual relationship of some sort -- with an active Broderick Boy, allowed them use of a vehicle for a shooting of a dropout Franklin Boy within Broderick Boy territory, switched cars after the shooting, concealed the suspect car after the shooting prior to arrest, was assisting in getting hygiene supplies for the shooter[] following the shooting, and continued to conceal the suspect vehicle even after in custody. [¶] Based on those specific facts, do you have an opinion as to whether those crimes were committed for the benefit of, at the direction of, or in association with [a] criminal street gang with a specific intent to promote, or further, or assist in any felony criminal conduct by a gang member?" The detective also answered these actions would have been taken for the benefit of and in association with the Broderick Boys gang with the specific intent to assist in criminal conduct by gang members.

**2. *Analysis***

Humble argues the evidence does not support a conclusion her crime of being an accessory to Reyes's criminal conduct, i.e., providing assistance in his attempt to avoid apprehension after the fact, was either gang related or committed with the specific intent required by the gang statute. This is so, Humble argues, because (1) she was not a gang member herself, (2) she knew Reyes for only "a short period of time," (3) nothing in her Facebook postings indicated she had a gang-related purpose in assisting Reyes to avoid apprehension, (4) the underlying shooting was not gang related, and (5) even if the shooting was gang related, there is no evidence she knew the shooting was gang related. We are not persuaded.

First, we have already rejected the assertion the shooting was not gang related. Substantial evidence supports a conclusion it was. However, even if Humble did not know as much, such knowledge is not required in order to sustain her gang enhancement. Gang enhancements are count-specific. Her conviction, to which her gang enhancement

28

was attached, was for aiding Reyes in his attempt to avoid apprehension.  The question then is whether there is substantial evidence *that crime* was committed "in association with any criminal street gang" and "with the specific intent to . . . assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1).)

Second, it does not matter that Humble is not herself a gang member.  "There is no requirement that the defendant be an active or current member of the gang to establish the enhancement under section 186.22, subdivision (b)(1)."  (*People v. Villa-Gomez* (2017) 9 Cal.App.5th 527, 539-540.)  Instead, the enhancement "applies to '*any person* who is convicted of a felony committed for the benefit of, at the direction of, or in association with' the gang and who acted with the requisite specific intent. . . . Gang membership is simply circumstantial evidence establishing that the crime was gang related and a motive for why a defendant may have harbored the 'specific intent to promote, further, or assist in any criminal conduct by gang members.'  [Citations.]"  (*Ibid.*)  Thus, while we agree such circumstantial evidence does not exist in this case, and further accept her assertion she knew Reyes for only a short period of time and did not reveal any gang-related motive on Facebook, these facts do not negate other evidence supporting Detective Herrera's opinion the crime was both gang related and committed with the requisite specific intent.

The evidence supporting the detective's opinion was incorporated into the hypothetical question posed by the prosecutor.  Humble was involved in a dating relationship with Lovett, an active Broderick Boys gang member.  Lovett and Reyes were friends, and far from hiding their gang member status, both men proudly displayed it in highly visible gang-related tattoos.  A reasonable inference from all of the evidence is that Humble would have known both Lovett and Reyes were gang members.  Humble was acting in association with a criminal street gang when she sent Reyes audio files of police dispatch traffic relating to the shooting, had her ex-boyfriend's mother rent a motel room for Reyes, Lovett, Landowski, and herself at the La Quinta Inn after the shooting,

and was carrying Reyes's gun in her waistband when law enforcement took them into custody. The evidence also supports a conclusion Humble assisted in keeping Landowski's Mustang hidden while she was in jail. A reasonable jury could have concluded these actions, i.e., those comprising the crime of being an accessory after the fact, were taken in association with a criminal street gang.[8]

We also conclude these facts support a conclusion Humble possessed the specific intent to assist in criminal conduct by gang members. If successful, helping Reyes avoid apprehension would have assisted a known gang member in committing any number of crimes. " 'There is no statutory requirement . . . that the evidence establish specific crimes the defendant intended to assist . . . gang members in committing.' " (*Albillar*, *supra*, 51 Cal.4th at p. 66, quoting *People v. Vasquez* (2009) 178 Cal.App.4th 347, 353-354; *In re Cesar V.* (2011) 192 Cal.App.4th 989, 1000.)

While the foregoing conclusions apply equally to Landowski, we shall specifically address her arguments challenging the gang enhancement. She argues the enhancement must be reversed because the evidence does not support a conclusion she "*knew* she was associating with a criminal street gang, or that she *knew* that she was assisting a gang member in *gang related* criminal conduct." First, we reject the notion Landowski did not know Reyes was a gang member. As with Humble, notwithstanding the short period of time she apparently knew Reyes, the record supports a conclusion she knew he was a gang member. Indeed, as Reyes's sexual partner, she would have had an up-close view of each of his gang-related tattoos.

Second, there is no requirement that Landowski knew she was assisting Reyes in gang-related criminal conduct. She need only have intended to "assist in *any* criminal

---

[8] We have deliberately not included the trip to Rite Aid because Detective Herrera discounted that fact in his response to the hypothetical questions, saying the purchase of hygiene products "could or could not be" gang-related conduct.

conduct by gang members." (§ 186.22, subd. (b)(1), italics added.) Landowski admits this comports with the plain meaning of the statute, but argues, "the result is absurd." We disagree. We also conclude the various hypothetical scenarios she posits in her briefing are inapt because they deal with aiding and abetting a gang-related crime where the aider and abettor has no knowledge of the direct perpetrator's gang member status or the fact the crime aided and abetted was gang related. However, as we have already explained, substantial evidence supports a conclusion Landowski knew Reyes was a gang member. Moreover, Landowski was not convicted as an aider and abettor of the underlying crimes arising out of the shooting, i.e., assault with a semiautomatic firearm and attempted murder. Landowski was convicted of being an accessory after the fact. As to that crime, substantial evidence supports the conclusion she knowingly associated with a criminal street gang with the specific intent to assist in criminal conduct by gang members.

We conclude the evidence is sufficient to support the gang enhancements attached to Humble's and Landowski's accessory convictions.

REMAINING CONTENTIONS

### III

### *Hearsay Claim*

Relying on *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), Humble contends the trial court prejudicially erred and violated her federal constitutional rights by allowing Detective Herrera to relate inadmissible hearsay to the jury. For example, she cites an exchange between the prosecutor and the detective in which the latter relied, in part, on a Facebook conversation between Reyes and another individual to conclude Reyes was an active gang member. In that Facebook conversation, which occurred the day before the shooting, Reyes admitted to having a .22 caliber gun, the same caliber used to shoot S. and recovered from Humble at the La Quinta Inn. Humble also cites an exchange between Reyes and Lovett in which Reyes tells Lovett he is "on a hunt" with "new information as new artillery" and Lovett responds by telling Reyes he has "strong

31

Norteño traits." The detective opined this exchange "shows they're out there putting in work" on behalf of both the Norteño and Broderick Boys gangs.[9]

In *Sanchez*, *supra*, 63 Cal.4th 665, our Supreme Court held: "When any expert relates to the jury case-specific out-of-court statements, and treats the content of those statements as true and accurate to support the expert's opinion, the statements are hearsay. It cannot logically be maintained that the statements are not being admitted for their truth. If the case is one in which a prosecution expert seeks to relate *testimonial* hearsay, there is a confrontation clause violation unless (1) there is a showing of unavailability and (2) the defendant had a prior opportunity for cross-examination, or forfeited that right by wrongdoing." (*Id*. at p. 686, fn. omitted.) There, the prosecution's gang expert based his opinion that the defendant was a member of a certain gang on various police contacts, during which the defendant was in the company of members of that gang, and on statements he made when given a "STEP notice" informing him that he was associating with a known gang. (*Id*. at pp. 672-673.) The expert admitted he had never met the defendant, was not present when the STEP notice was given or during any of the police contacts, and that his knowledge of these matters was derived from police reports and a field identification (FI) card. (*Id*. at p. 673.)

The court held these case-specific out-of-court statements in the police reports, STEP notice, and FI card were hearsay because they were "considered by the expert, and

---

[9]     Humble also refers to Detective Herrera's reliance on "Landowski's Facebook account" as a basis for his conclusion Humble's "conduct was for the benefit of Broderick Boys," citing five pages of the reporter's transcript without explaining what specifically she claims to be the inadmissible hearsay contained in those pages. Our review of those pages reveals the detective was referred to two exhibits containing photographs from Humble's and Landowski's Facebook pages in which the two were together in Landowski's Mustang with Lovett. However, photographs are "not hearsay," but rather "demonstrative evidence, depicting what the camera sees." (*People v. Cooper* (2007) 148 Cal.App.4th 731, 746.)

32

offered to the jury, as true." (*Sanchez*, *supra*, 63 Cal.4th at p. 684.)  The court continued: "Ordinarily, an improper admission of hearsay would constitute statutory error under the Evidence Code.  Under [*Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177]], however, if that hearsay was testimonial and *Crawford*'s exceptions did not apply, [the] defendant should have been given the opportunity to cross-examine the declarant or the evidence should have been excluded." (*Id*. at p. 685.)  Turning to the testimonial nature of the statements, the court held the police reports were testimonial because they "relate[d] hearsay information gathered during an official investigation of a completed crime" and were not "made in the context of an ongoing emergency . . . or for some other primary purpose." (*Id*. at p. 694.)  The court also held the portion of the STEP notice relied upon by the expert during his testimony was testimonial, explaining, "[t]hat portion recorded [the] defendant's biographical information, whom he was with, and what statements he made," and the officer who recorded that information did so primarily "to establish facts to be later used against [the defendant] or his companions at trial." (*Id*. at p. 696.)  Finally, the court noted the record did not reveal enough of the circumstances surrounding the preparation of the FI card to determine whether or not it was testimonial in nature, but "[i]f [the FI] was produced in the course of an ongoing criminal investigation, it would be more akin to a police report, rendering it testimonial." (*Id*. at p. 697.)

Here, Humble makes clear she "does *not* assert that [Detective] Herrera's basis testimony constituted *testimonial* hearsay in violation of [*Crawford v. Washington* (2004) 541 U.S. 36]."  Instead, she claims the challenged basis testimony should have been excluded under state evidentiary law and failure to do so amounted to a violation of her federal constitutional right to due process.  In response, the Attorney General argues the claim is forfeited because Humble did not object to the challenged testimony in the trial court, the testimony did not violate *Sanchez, supra,* 63 Cal.4th 665 because it was related to background information, and in any event, the admission of any case-specific hearsay

was harmless because (1) the jury was instructed the challenged evidence was not admitted against Humble and (2) Humble's association with Landowski, Reyes, and Lovett, the latter two being active Broderick Boys, was independently proven by other evidence.

We need not determine whether or not the claim is forfeited, or whether the challenged testimony amounted to case-specific hearsay as opposed to background information, because we agree with the Attorney General that any case-specific hearsay was manifestly harmless. This is because the conclusion Detective Herrera reached from this challenged testimony, i.e., Reyes and Lovett were active Broderick Boys gang members, was overwhelmingly supported by other properly admitted evidence. The detective testified he had personal knowledge of Lovett's active membership in the Broderick Boys gang. And, as already discussed, Reyes admitted he was an active Broderick Boys gang member during his trial testimony. Additionally, Humble's relationship with Lovett, her friendship with Landowski, and the fact that she was previously with both in Landowski's Mustang was proven through non-hearsay content on her own Facebook page. Moreover, her association with them and Reyes both during and following the shooting was proven through R.'s testimony placing her in the Mustang at the time of the shooting, testimony from the manager of the Crowne Plaza motel placing her there with Reyes and Landowski later in the day, testimony from the mother of an ex-boyfriend admitting to having rented a room for her at the La Quinta Inn, and testimony from various law enforcement officers establishing she was apprehended in the latter motel room, with Reyes and Landowski, while carrying in her waistband the gun Reyes used to shoot S.

Simply put, regardless of which standard of prejudice is employed, we cannot conclude Humble was prejudiced by the admission of the challenged testimony.[10]

## IV

### *Requested Special Instructions*

Landowski asserts the trial court prejudicially erred and violated her federal constitutional rights by declining to provide the jury with two requested special instructions elaborating on the elements of the gang enhancement. We disagree.

The jury was instructed as to the elements of the gang enhancement with CALCRIM No. 1401. Tracking the language of the statute, this instruction provides in relevant part: "To prove this allegation, the People must prove that: [¶] 1. The defendant committed the crime for the benefit of, at the direction of, or in association with a criminal street gang; [¶] AND [¶] 2. The defendant specifically intended to assist, further, or promote criminal conduct by gang members."[11]  (See § 186.22, subd. (b)(1).)

---

[10]     We also note, as the Attorney General correctly points out, the challenged hearsay was initially admitted into evidence during the testimony of a different law enforcement officer, Sergeant Jason Winger. During his testimony, the trial court repeatedly advised the jury such evidence was admitted only against Reyes. No similar admonishment was provided during Detective Herrera's testimony. However, at the close of the evidence, the jury was advised "certain evidence was admitted for a limited purpose" and to "consider that evidence only for that purpose and no other." Humble argues (under a separate heading labeled instructional error) the jury would have been unable to "logically follow" such a limiting instruction because the jury was also instructed to "decide whether information on which [Detective Herrera] relied was true and accurate." First, this argument is not so much an instructional error claim as it is an argument the hearsay claim was not harmless. Second, even assuming Humble is correct such a limiting instruction could not have been followed, we nevertheless conclude the error was harmless based on the strength of the other evidence, recounted above.

[11]     The instruction then defines "criminal street gang" and "pattern of criminal gang activity," also tracking the language of the statute. Landowski does not take issue with these portions of the instruction.

Landowski requested the trial court to supplement this statement of the elements with two special instructions. The first proposed to instruct the jury: "If you find a defendant guilty of being an accessory to a felony, you cannot find her guilty of committing the felony for the benefit of, at the direction of[,] or in association with a criminal street gang unless you also find that at the time she was an accessory she knew the perpetrator was then an active member of a criminal street gang. [¶] The People have the burden of proving this fact beyond a reasonable doubt. If the People have not met this burden, you must find the allegation has not been proved." The second proposed to instruct the jury: "Not every crime - even if committed by a gang member - is subject to the enhancement for a crime committed for the benefit of, at the direction of[,] or in association with a criminal street gang. This enhancement applies when a defendant personally commits a gang-related felony with the specific intent to aid members of that gang."

Both proposed instructions were properly refused. CALCRIM No. 1401 adequately stated the elements of the gang enhancement in the language of the statute itself. " '[T]he language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification. If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' [Citations.]" (*People v. Estrada* (1995) 11 Cal.4th 568, 574.) Even where a defendant requests amplification, as here, the trial court must refuse a proffered pinpoint instruction that misstates the law, and may do so if the instruction is merely duplicative of other proper instructions. (*People v. Sanders* (1995) 11 Cal.4th 475, 560.) There is also a "long settled rule that an instruction that may confuse the jury should not be given." (*People v. Hendricks* (1988) 44 Cal.3d 635, 643.)

Here, the portion of the first proposed special instruction informing the jury the People possess the burden of proving the first element of the gang enhancement was

properly refused because it "merely duplicates the standard instructions . . . explaining the prosecution's burden to prove guilt beyond a reasonable doubt." (*People v. Bolden* (2002) 29 Cal.4th 515, 559.) The remainder of the first proposed instruction either misstates the law or is confusing. The instruction appears to require that a defendant who commits the crime of "being an accessory to a felony" must have also committed "the felony" for the benefit of, at the direction of, or in association with a criminal street gang. In other words, the proposed instruction appears to require the underlying felony to have been gang related. However, as we have already explained in detail, it is not the underlying felony that must have been gang related, but rather the act of being an accessory to that felony, i.e., aiding a principal in that felony to avoid arrest. Moreover, the proposed instruction requires the prosecution to prove the defendant "knew the perpetrator was then an active member of a criminal street gang." Read in conjunction with the remainder of the instruction, the "then" implies at the time the underlying felony was committed. But that is not the law either. Even assuming Landowski had no idea Reyes was a gang member when he shot S., but found out immediately thereafter and then aided him in avoiding arrest, her commission of the accessory offense would still have been in association with a criminal street gang. Nor would it necessarily be required that the person aiding a principal avoid arrest for a felony knew that principal was an active gang member at all. What the enhancement requires is for such aiding to have been gang related.

The second proposed special instruction was also properly refused as confusing and unnecessarily duplicative of CALCRIM No. 1401. While it begins by correctly stating that not every crime is "committed for the benefit of, at the direction of[,] or in association with a criminal street gang," even where the crime is committed by a gang member, nothing in CALCRIM No. 1401 would have suggested otherwise. The proposed instruction then provides the gang enhancement applies only if "a defendant personally commits a gang-related felony with the specific intent to aid members of that

37

gang." The "gang-related felony" language is simply shorthand employed in the case law to describe the first element that CALCRIM No. 1401 more completely defines. Moreover, read together with the first proposed special instruction, "personally" may have suggested to the jury that the gang enhancement could not be found true as to Landowski unless she "personally" committed the underlying felony. That is not the law. Finally, "with the specific intent to aid members of that gang" is not precise. CALCRIM No. 1401 provides the more accurate statement taken from the statute itself, "specifically intended to assist, further, or promote criminal conduct by gang members." (See § 186.22, subd. (b)(1).)

Landowski's proposed special instructions were properly refused.

## V

### *Prosecutorial Misconduct*

Returning to Reyes, he claims the prosecutor engaged in prejudicial misconduct by "disobey[ing] court orders, fail[ing] to warn her witnesses about inadmissible evidence, [and] imply[ing] a defendant must speak despite the right to silence." The Attorney General argues the claim is forfeited and, in any event, lacks merit. We conclude two asserted bases for this claim are forfeited. The sole remaining basis was arguably misconduct, but was manifestly harmless.

### A.

### *Relevant In Limine Rulings*

Reyes moved in limine to exclude "all evidence of [his] criminal history and juvenile record" from the prosecution's case-in-chief and for impeachment purposes if he decided to testify. He did so on relevance grounds, as well as under Evidence Code sections 352 and 1101, and further cited his federal constitutional rights to confrontation and due process. The prosecution moved in limine to introduce such evidence in its case-in-chief, asking the trial court to allow Reyes's "prior crimes and gang contacts [to] be admitted . . . to prove history of [his] gang ties and involvement, motive, specific intent,

38

and identity," citing Evidence Code section 1101, subdivision (b), and a number of gang cases.

At the hearing on these in limine motions, after Lovett's counsel[12] asked the trial court to inquire into which prior crimes the prosecution sought to admit because it would need to engage in an analysis under Evidence Code section 352 to ensure probative value was not substantially outweighed by the danger of undue prejudice, Reyes's counsel joined in these comments and argued Reyes's prior convictions had "absolutely nothing to do . . . with the crimes in front of the Court now." The trial court responded: "Doesn't it have connection with gang affiliation?" Reyes's counsel answered: "Absolutely not." After some discussion back and forth, counsel argued Reyes's prior crimes were irrelevant to prove "motive, specific intent, identity," but acknowledged "some of the prior crimes may have relevance to his gang contacts, but we need to know which crimes the People want to introduce." Lovett's counsel then added to the argument that the prosecution would need to be specific with respect to which crimes were sought to be introduced, and for what purpose, in order for the trial court to properly analyze admissibility under Evidence Code section 1101, subdivision (b). Reyes's counsel again joined in these comments.

The prosecutor responded that the request to introduce prior crimes and gang contacts "relates specifically to the gang expert," i.e., Detective Herrera's testimony as to Reyes's and Lovett's status as active gang members and his opinion the charged crimes were gang-related and committed with the requisite specific intent. The prosecutor also indicated the prior crimes sought to be admitted through the detective's testimony would be limited to the crimes to which he previously testified at the preliminary hearing, and also included in a report provided to defense counsel in

---

[12]    Lovett's case had not yet been severed.

discovery, with the addition of one crime "alleged against [Reyes] while he was in the jail, [involving him] having a weapon in the jail." After additional argument regarding Evidence Code section 1101, subdivision (b), during which the prosecutor acknowledged citing that section in her in limine motion was "slightly misleading" because "as of now the contacts and the convictions are solely going to be introduced through Detective Herrera, for his opinion," the trial court reserved ruling on the motion, adding, "but it does not sound as if you're pressing the point on having that come in under 1101(b)." The prosecutor responded: "Correct. At least, not at this point, no. It would just be for the gang expert's testimony."

Later in the hearing, when the trial court turned to Reyes's motion to exclude his criminal history, his counsel stated: "I think the Court has already ruled on that." He added: "It is my understanding from our prior discussions this morning that the People intend on introducing what they did at the preliminary hearing along with the bullet point discovery that was provided by Detective Herrera, which I have received, and the People want to attempt to introduce evidence of my client's arrest from -- regarding an incident at the jail in May of this year, where my client is now charged with possession of a weapon, while in jail and gang enhancements, and I would, regarding that incident . . . I would object to the Court or to the People allowing or being allowed to present that evidence. I don't think it is relevant to this case." Counsel further argued admission of evidence of this alleged crime would violate Evidence Code section 352 and Reyes's federal constitutional rights. In response, the prosecutor argued Reyes's possession of a weapon in jail "goes to show [he's] still active, even when he's in jail."

The trial court ruled evidence of this specific conduct inadmissible under Evidence Code section 352. However, there is either an error in the reporter's transcript or the trial court misspoke during its ruling because after clearly explaining "that the probative value is substantially outweighed by the possible prejudice," the transcript indicates the trial court stated: "I'll allow you to get in to that." Later in the trial, after the second asserted

40

incident of prosecutorial misconduct described in detail below, the trial court confirmed it had in fact ruled the incident of possession of a weapon at the jail inadmissible.

**B.**

*Asserted Prosecutorial Misconduct*

The first asserted incident of prosecutorial misconduct occurred during the prosecutor's direct examination of West Sacramento Police Officer Alisha Slater, the officer who first arrived at the scene of the shooting. With respect to R. identifying the shooter as "Chubbs," the prosecutor asked the officer how she linked that name to Reyes. The officer answered: "Because during that time I was investigating him with the FBI on the --" Reyes's counsel objected on relevance grounds. The trial court overruled the objection. Counsel asked to approach. The trial court did not allow him to do so. Counsel then stated: "Your Honor, I have to state an objection for the record." The trial court said he could do so "at the first possible opportunity." The prosecutor then asked the officer: "Based on your investigation of [Reyes], were you aware that he also went by the name of Chubbs?" The officer answered: "Yes." The prosecutor asked whether that was how she "linked those two names together." The officer answered: "From that and from an investigation I did in 2011." The prosecutor asked, "[W]hat was the basis of that investigation?" The officer answered: "I was investigating him during that time for the --" Reyes's counsel again objected on relevance grounds. The trial court responded: "Why don't -- she was familiar with the name. Why don't we just move on from there, please." The prosecutor then asked: "So you were investigating him as part of two separate investigations, and that's how you knew that [Reyes's] name was associated with the name Chubbs?" The officer answered: "Yes." The officer also testified she broadcast over dispatch that "Chubbs" was Reyes's nickname and that he might be monitoring a police scanner and therefore probably knew they had made that connection. Reyes's counsel again objected, this time adding, "speculation" and "nonresponsive" to

41

the grounds. This objection was sustained and the jury was told to disregard the officer's "speculation as to what [Reyes] would have known."

At the next break in the proceedings, Reyes's counsel moved for a mistrial. Arguing the foregoing testimony violated the trial court's in limine ruling "regarding what parts of [Reyes's] prior criminal history would be admissible," counsel added: "When I made the objection, the questions should have stopped. [The prosecutor] continued with the questions. The gist of the -- of testimony was that it could have been limited to the fact that she knew my client from prior incidents at West Sacramento and that Chubbs is [Reyes], but it went beyond that, which has now absolutely tainted this jury and will prevent my client from getting a fair and impartial trial in this case in the fact that she has put out there that my client was under investigation by the FBI, and there was a prior incident in 2011." The trial court denied the mistrial motion, but offered to provide "some kind of instruction to the jury," presumably to disregard the officer's statements about the prior investigations involving Reyes, depending on whether Reyes's counsel wanted one. Counsel did not request such an instruction and none was given.

The second asserted incident of prosecutorial misconduct occurred during Detective Herrera's testimony. After the detective testified Reyes satisfied nine of the eleven criteria his department used to validate gang members, the prosecutor asked whether his active participation in the Broderick Boys continued following his incarceration. The detective answered: "Yes." Asked how so, the detective answered: "He was caught with a knife." Reyes's counsel objected and asked to approach. Thereafter, an unreported discussion took place. The trial court then struck the detective's answer and admonished the jury "not to consider that response for any reason in [its] evaluation of the case."

At the next break in the proceedings, Reyes's counsel stated for the record that he made a mistrial motion during the unreported sidebar, arguing the prosecutor

42

violated the trial court's in limine ruling excluding evidence Reyes possessed a weapon while in jail. Counsel renewed the motion and argued the prejudice flowing from the jury hearing this evidence in conjunction with the aforedescribed evidence Reyes was under investigation by the FBI made it impossible for Reyes to receive a fair trial. In response, the prosecutor claimed she believed the trial court had allowed her to "get [into] [Reyes's] conduct while in custody" and "if the Court ruled differently, it was an honest mistake." The prosecutor also argued the admonition already provided by the trial court "would cure any potential error." The trial court confirmed it had in fact excluded the evidence, but denied the mistrial motion because the questioning was shut down before the incident at the jail was described in depth, the jury was admonished to disregard the detective's response, and even combined with the evidence Reyes was under investigation by the FBI, the prejudice did not "rise[] to the level of sustaining the motion for mistrial."

The final asserted incident of prosecutorial misconduct also occurred during Detective Herrera's testimony. In response to the prosecutor's first statement of the hypothetical question based on Humble's conduct, the detective answered as though the hypothetical involved both Humble and Landowski, stating: "On the -- based on the facts that you just gave me from the hypothetical, that those females assisting are definitely associating and assisting an active gang member. They've shown that by, as you stated, hiding evidence even after the fact, after the crime was committed, *assisting with not saying anything about*, whether they could have told the truth about what happened, where the vehicle was, when they were --" (Italics added.) Landowski's counsel objected and asked to approach. Following an unreported sidebar discussion, the trial court struck the detective's response and admonished the jury to disregard it. The prosecutor then rephrased the hypothetical, after which the detective provided the answer we have already described during our discussion of the sufficiency of the evidence claims.

At the next break in the proceedings, Landowski's counsel stated for the record his objection to Detective Herrera's first attempt to answer the hypothetical was based on the detective's opinion that the "refusal to make statements that would implicate" a gang member "indicated aiding a gang," adding: "It's totally improper to use a defendant's silence in any way. The jury is instructed not to consider it in any way, and it was totally improper to have this officer testify that they should have given information. [¶] So I believe that this was a very serious breach, and that's why I objected. I'm not convinced that the -- telling the jury to disregard. In addition[] to the other matters that [Reyes's counsel] has brought up, we're getting a cumulative effect. That's why I believe that this is a proper mistrial motion." Reyes's counsel joined in this argument. In response, the prosecutor acknowledged she understood the concern, but argued: "Obviously, I can't speak for what was in the gang expert's head when he was -- began his answer, but it's my opinion that he was talking about the concealment of the car and continued concealment of the car, not the defendant's statement, that wasn't part of the hypothetical, but again I'm not inside of his head, but it was cut off in the middle, he wasn't given a chance to explain. It was stricken immediately, and we restarted with very -- I was very careful in how I worded the hypothetical[.]" Reyes's counsel then reiterated the concern that "the pattern of inadmissible evidence coming in to the trial is now three fold" and asked the trial court to declare a mistrial based on the "cumulative effect on the jury." This mistrial motion was denied as well.

## C.

### *Forfeiture*

The Attorney General argues Reyes's assertions of prosecutorial misconduct are forfeited because he "never raised any prosecutorial misconduct claim or requested a curative admonition during discussion of the three areas of evidence that [he] addresses here[.]" Acknowledging "as a general rule, a defendant must make a timely and specific assignment of misconduct, as well as request that his [or her] jury be admonished to

44

disregard the impropriety" (see *People v. Hill* (1998) 17 Cal.4th 800, 820), Reyes argues, "he should be deemed to have been relieved of that obligation, for what the [Attorney General] overlooks is that the trial court made it clear it did not want counsel to make 'speaking objections.' "  Accordingly, Reyes argues, with respect to each asserted basis of prosecutorial misconduct, his counsel moved for a mistrial at the first available opportunity.

We conclude the first asserted basis of this prosecutorial misconduct claim is forfeited because Reyes did not request a curative admonition, even after one was offered by the trial court.  While "the absence of a request for a curative admonition does not forfeit the issue for appeal if 'the court immediately overrules an objection to alleged prosecutorial misconduct [and as a consequence] the defendant has no opportunity to make such a request[]' " (*People v. Hill*, *supra*, 17 Cal.4th at p. 820), here, after overruling Reyes's objection to the FBI investigation evidence, in response to his mistrial motion, the trial court specifically offered to provide such an admonition and Reyes did not accept that offer.  We also conclude instructing the jury to disregard this evidence would have cured the harm arising therefrom.  (See *People v. Price* (1991) 1 Cal.4th 324, 447 [without a request for a curative admonition, "the point is reviewable only if an admonition would not have cured the harm caused by the misconduct"].)

With respect to the second asserted basis of this prosecutorial misconduct claim, while Reyes did not use the phrase "prosecutorial misconduct," we conclude the substance of his objection and argument on the mistrial motion would have apprised the trial court he was asserting such a claim.  The mistrial motion was based on the prosecutor violating the trial court's in limine ruling regarding the incident at the jail, which is a claim of prosecutorial misconduct.  (See, e.g., *People v. Tate* (2010) 49 Cal.4th 635, 690.)  The trial court also instructed the jury to disregard the evidence, presumably in response to a request from Reyes's counsel at the unreported sidebar.  Whether this admonition in fact cured the harm arising from the prosecutor's violation of the in limine

45

ruling is a matter we address shortly. For now, we simply conclude this asserted basis for the prosecutorial misconduct claim is preserved for review.

The final asserted basis of the prosecutorial misconduct claim is also forfeited. The third mistrial motion was based on the prosecutor eliciting testimony argued to be in violation of the right to silence of *Humble and Landowski*. Here, for the first time, he asserts, "allowing [Detective] Herrera to so testify . . . violated [Reyes's] constitutional right to silence." Setting aside the obvious problem of whether a particular defendant's constitutional right to silence may be violated by reference to silence on the part of *someone else*, because this is not the claim raised below it may not be advanced on appeal. "[I]n order to avoid forfeiture, the defendant must have objected on the 'specific grounds' asserted as error on appeal." (*People v. McCoy* (2013) 215 Cal.App.4th 1510, 1525, quoting *People v. Fuiava* (2012) 53 Cal.4th 622, 689.)

## D.

### *Analysis*

" 'A prosecutor's conduct violates the Fourteenth Amendment to the federal Constitution when it infects the trial with such unfairness as to make the conviction a denial of due process.' [Citations.] Under California law, a prosecutor who uses deceptive or reprehensible methods of persuasion commits misconduct even if such actions do not render the trial fundamentally unfair." (*People v. Doolin* (2009) 45 Cal.4th 390, 444.)

In *People v. Erickson* (1997) 57 Cal.App.4th 1391, as in this case, the prosecutor elicited testimony from an expert witness that violated one of the trial court's in limine rulings. There, the defendant was convicted of the first degree murder of her abusive former boyfriend, with whom she still resided, and the challenged evidence was the expert's opinion testimony that the defendant "did not view herself in imminent danger of being killed by [the victim] or even significantly harmed." (*Id*. at p. 1402.) Also like this case, an objection to this evidence was sustained and the jury was instructed to disregard

it. Assuming the defendant's prosecutorial misconduct claim was properly preserved for review, the Court of Appeal concluded, "the stricken testimony did not render the trial fundamentally unfair, nor did the prosecutor's failure, if any, to prevent the testimony amount to 'a deceptive or reprehensible method of persuasion. Accordingly, it did not constitute misconduct under federal or state standards.' [Citations.]" (*Id*. at p. 1403.) Finally, the court further concluded any assumed prosecutorial misconduct was harmless under the state standard for assessing prejudice. (*Ibid*.)

Here, while we are troubled by the prosecutor's elicitation of evidence previously ruled inadmissible by the trial court, we cannot conclude the improper elicitation of this evidence rendered Reyes's trial fundamentally unfair, particularly since the questioning was promptly shut down and the jury was instructed to disregard the testimony. Thus, there was no due process violation. We need not decide the closer question of whether the prosecutor's conduct amounted to misconduct under the state standard because, even assuming it did, there is no reasonable probability of a more favorable outcome absent the assumed misconduct. Detective Herrera was not allowed to go into any of the details of the knife possession and, again, the jury was promptly instructed to disregard his testimony that Reyes "was caught with a knife." Moreover, in light of Reyes's own testimony admitting to being a gang member, to having "hurt people" as part of his gang activities, and to shooting S. because he got "mad" when S. rode away from the confrontation, we conclude the brief reference to his having possessed a knife in jail was manifestly harmless.

## VI

### *Retroactivity of SB 620*

Reyes also contends we must remand the matter for a new sentencing hearing because SB 620, which became effective January 1, 2018 and amends sections 12022.5 and 12022.53 to give the trial court discretion to strike firearm enhancements in the interest of justice, applies retroactively to cases not yet final on appeal.

47

Reyes was sentenced on September 2, 2015. The law at that time did not allow the trial court to strike his firearm enhancements in the interest of justice, but rather required their mandatory imposition. (See former §§ 12022.5, subd. (c), 12022.53, subd. (h) (Stats. 2010, ch. 711).) Effective January 1, 2018, SB 620 amended both sections to provide: "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section. The authority provided by this subdivision applies to any resentencing that may occur pursuant to any other law." (Stats. 2017, ch. 682, §§ 1 & 2.)

In a supplemental brief, relying on *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), Reyes argues the amendments to these sections apply to him because his judgment is not yet final. In *Estrada*, our Supreme Court stated: "When the Legislature amends a statute so as to lessen the punishment it has obviously expressly determined that its former penalty was too severe and that a lighter punishment is proper as punishment for the commission of the prohibited act. It is an inevitable inference that the Legislature must have intended that the new statute imposing the new lighter penalty now deemed to be sufficient should apply to every case to which it constitutionally could apply." (*Id.* at p. 745.) This includes "acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Ibid.*) Thus, under *Estrada*, absent evidence to the contrary, we presume the Legislature intended a statutory amendment reducing punishment to apply retroactively to cases not yet final on appeal. (*Id.* at pp. 747-748; *People v. Brown* (2012) 54 Cal.4th 314, 324.) Our Supreme Court has also applied the *Estrada* rule to amendments giving the trial court discretion to impose a lesser penalty. (*People v. Francis* (1969) 71 Cal.2d 66, 76.)

Reyes argues the Legislature expressed its intent that SB 620 apply retroactively by expressly declaring in both section 12022.5, subdivision (c), and section 12022.53, subdivision (h), "that the amended statute is to apply to resentencing." And even aside from this expression of retroactive intent, Reyes argues, the rule of *Estrada, supra,* 63

48

Cal.2d 740 still applies because no "contrary legislative intent can be gleaned from the language of the enactment or its legislative history." Thus, because his judgment is not yet final, Reyes asserts we must remand the matter for the trial court to decide whether or not to strike his firearm enhancements in the interest of justice. We agree the rule of *Estrada* requires retroactive application of SB 620 to Reyes's case. Indeed, the Attorney General correctly concedes the point in his supplemental briefing on the matter.

Nevertheless, citing *People v. Gutierrez* (1996) 48 Cal.App.4th 1894 (*Gutierrez*), the Attorney General argues remand is not appropriate because the trial court " 'would not . . . have exercised its discretion to lessen the sentence.' " We are not persuaded. In *Gutierrez*, our colleagues at the Second Appellate District declined to remand the defendant's matter for resentencing despite the fact the trial court erroneously believed it lacked discretion to strike his prior strike conviction under the three strikes law. As the court explained its decision, "the trial court indicated that it would not, in any event, have exercised its discretion to lessen the sentence" and therefore "no purpose would be served in remanding for reconsideration." (*Id*. at p. 1896.)

Here, the trial court made no comparable finding as to whether or not Reyes's firearm enhancements should be stricken. Instead, the Attorney General relies on the fact the trial court imposed consecutive upper term sentences and made "abundantly clear that upper terms were supported by a predomination of aggravating factors." But the decision to impose consecutive and upper term sentences is not the same as the decision to strike a firearm enhancement in the interest of justice. While we agree the trial court relied on the aggravated nature of both the crime and Reyes's personal circumstances in imposing "the harshest punishment available," SB 620 allows for the striking of even the most serious firearm enhancements, i.e., those imposed under section 12022.53, subdivision (d), involving the discharge of a firearm resulting in death or great bodily injury. Thus, while Reyes's crimes were extremely serious, the Legislature has determined it might be appropriate to strike a firearm enhancement in such a case.

49

Whether to do so in this case is up to the trial court, in the exercise of its sound discretion.

## VII

### *Retroactivity of SB 136*

Finally, Reyes asserts we must also remand the matter to the trial court with directions to strike two one-year prior-prison-term enhancements because SB 136 (2019-2020 Reg. Sess.) that became effective January 1, 2020 and eliminates such enhancements for Reyes's crimes, also applies retroactively to cases not yet final on appeal. The Attorney General concedes the point. We accept the concession.

Effective January 1, 2020, SB 136 amended section 667.5, subdivision (b), to remove the one-year enhancement for prior prison terms, except when the offense underlying the prior prison term was a sexually violent offense. (See § 667.5, subd. (b).) Because SB 136 reduces sentences for a crime it applies retroactively to convictions not final on appeal absent evidence of a contrary legislative intent. (See *People v. Brown*, *supra*, 54 Cal.4th at pp. 323-324; *Estrada*, *supra*, 63 Cal.2d at p. 745.) SB 136 therefore applies to this case.

The offenses underlying Reyes's prior prison term were vehicle theft and possession of a concealed weapon. These offenses do not qualify under the amended statute because they are not sexually violent offenses. Accordingly, the prior-prison-term enhancements cannot stand. Reyes asks us to remand the matter to the trial court with directions to strike the enhancements. We shall do so. (See *People v. Buycks* (2018) 5 Cal.5th 857, 893 ["when part of a sentence is stricken on review, on remand for resentencing 'a full resentencing as to all counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances' "].)

## DISPOSITION

The judgment of conviction entered against defendant Michael Anthony Reyes is affirmed and the matter is remanded to the trial court for a new sentencing hearing,

50

during which the trial court shall (1) exercise its discretion as to whether to strike his various firearm enhancements in the interest of justice, and (2) strike his prior-prison-term enhancements.  The judgments entered against defendants Lisa Humble and Liberty Danielle Landowski are affirmed in their entirety.


          /s/
HOCH, J.

I concur:


          /s/
BUTZ, Acting P. J.


51

Murray, J., Concurring.

I concur in the majority opinion, but write separately to emphasize several matters related to Discussion part II.A, pertaining to the gang enhancement allegation the jury found true as to Reyes.

First, I think it important to emphasize that a gang member may have dual motives—personal and gang-related—in committing crimes. Indeed, it is not hard to see how many retaliatory assaults and murders by gang members might be motivated by both personal and gang-related reasons. For example, during his testimony, Reyes talked of knowing fellow Broderick Boys gang members since kindergarten and categorizing his relationships with people as friends, homies, and brothers. He described his gang as "real family oriented," and further explained that "everybody I grew up with I consider my family." Retaliation for harming one of those gang "family" members is likely to be motivated by personal affinity in addition to a desire to vindicate disrespect to the gang. The same can be said when someone publicly disrespects a gang member's actual family member, which, according to the uncontradicted gang culture testimony of the prosecution's gang expert, is one of the "biggest disrespects" there is in gang culture.

Second, I think it important to emphasize that, in analyzing gang cases for substantial evidence of gang enhancement elements, reviewing courts cannot simply look to match up facts in the case under review with facts discussed in other cases. For example, Reyes relies heavily on *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*), noting that he did not call out a gang name, display gang signs, wear gang clothing,[1] or

---

[1] The assertion that Reyes was not wearing gang clothing here is debatable. He wore a red and black jacket, and red is the Broderick Boys/Norteños color. It also appears that Reyes was a walking Broderick Boys billboard. He proudly displayed visible gang tattoos on his head and face, including the letter "B" on the side of his head and "East Yolo" on his face indicating he was "from Broderick," and "Aztec 14" on his face indicating he is a Norteño. Reyes acknowledged the tattoos on his face are a clear indication to other people that he "bang[s]."

1

engage in gang graffiti while committing his offenses, and there was no evidence of post-offense bragging to take credit for the crimes. Reyes suggests that because these facts are missing, as they were in *Ochoa*, there was not substantial evidence here. But that argument ignores the standard of review and the other evidence in the case.

In reviewing for substantial evidence, appellate courts are required to view the evidence in the light most favorable to the prosecution. (*Jackson v. Virginia* (1979) 443 U.S. 307, 319 [61 L.Ed.2d 560, 573]; *People v. Holt* (1997) 15 Cal.4th 619, 667.) "[W]e must examine the record independently for ' "substantial evidence—that is, evidence which is reasonable, credible, and of solid value" ' that would support a finding beyond a reasonable doubt." (*People v. Banks* (2015) 61 Cal.4th 788, 804.) We must accept all logical inferences that the jury may have drawn from circumstantial evidence. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) "If the circumstances reasonably justify the findings made by the trier of fact, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*People v. Kaufman* (2017) 17 Cal.App.5th 370, 380-381.) Indeed, it is well-settled that " '[a] reversal for insufficient evidence "is unwarranted unless it appears 'that upon *no hypothesis whatever* is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Penunuri* (2018) 5 Cal.5th 126, 142, italics added; see also *People v. Zamudio* (2008) 43 Cal.4th 327, 357; *People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Spencer* (1969) 71 Cal.2d 933, 937.) The same standard of review applies to determining the sufficiency of evidence supporting a gang enhancement. (*People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*); *People v. Weddington* (2016) 246 Cal.App.4th 468, 483.) The standard of review requires that we look at the *totality of circumstances in the case before us* to determine whether there is substantial evidence, not merely make a side-by-side comparison with other cases regarding evidence that supported or failed to support a finding of substantial evidence in those other matters.

Third, while the courts in *Ochoa, supra*, 179 Cal.App.4th at pages 657, 659, and *People v. Ferraez* (2003) 112 Cal.App.4th 925, 931, spoke of expert *testimony* being insufficient without evidentiary support, a close reading of those cases suggests that those courts were referring to the expert's bottom line *opinion* about the crime benefiting the gang not being sufficient in and of itself. In my view, the expert's other testimony can be part of the evidentiary support underlying the expert's bottom line opinion that the crime benefited the gang. For example, the expert's testimony about the gang's culture and habits is part of the evidentiary support underlying an inference that the conduct was committed for the benefit of the gang. (See *People v. Vang* (2011) 52 Cal.4th 1038, 1044 [gang experts may testify about the culture and habits of gangs]; *Ferraez*, at p. 930 [same].) So too is an expert's testimony that particular criminal conduct enhances the gang's reputation for viciousness (*Albillar, supra*, 51 Cal.4th at p. 63), or that the commission of violent crimes elevates the status of the gang member and the gang, and thus such conduct benefits the gang (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 354; *People v. Romero* (2006) 140 Cal.App.4th 15, 19).

Here, the totality of the circumstances established by the evidence supports the jury's finding that the shooting was committed for the benefit of Reyes's gang. In addition to the gang expert's testimony, there was evidence of Reyes's gang membership, his self-described gang activity on Facebook and in his own testimony, and the fact that the crime occurred in gang territory. The expert testified about the role of respect in gang culture and that gang culture dictated that Reyes had to retaliate for S. assaulting D. in front of Reyes's brother. This affront to Reyes's family in gang territory was apparently not a secret; Reyes learned about it on the streets, specifically in a store, from someone who knew Reyes and his family. Based on how Reyes learned of the incident, the jury could reasonably infer that Reyes realized the assault of D. in front of his brother was known to people on the streets and that, based on the expert's testimony about gang culture, he had to retaliate to protect and enhance his own gang status and protect and

3

enhance the gang's reputation. Failure to do so would jeopardize the reputation on the street he had worked to achieve, and it would make him and the gang look weak. On the other hand, as the gang expert testified, the gang benefits when a gang member makes a "bigger name" for himself.

Regarding the missing indicia of gang relation discussed in *Ochoa*, it was not necessary for Reyes to flash gang signs or announce the presence of the gang to get the word out on the street that he had vindicated the victim's disrespect because there were people associated with Reyes, as well as the victim's girlfriend who were present and who could spread the tale of Reyes's exploits on the streets. As the gang expert testified, gang members typically commit crimes in the presence of other people so there are people who can verify the gang member's deeds, and in the City of West Sacramento community, news of such exploits spreads like "wildfire."

There was substantial evidence that Reyes committed the crime here for the benefit of his gang.


/s/
MURRAY, J.

4